## Hetrick Estate

*Markowitz & Liverant,* for appellants.

*Edwin M. Buchen,* for Commonwealth.

GROSS, P. J., March 27, 1951.—H. B. Hetrick, also known as Dr. H. Bruce Hetrick, decedent, died August 11, 1948, unmarried and without issue.

On May 17, 1946, decedent executed an irrevocable agreement with York Trust Company of York, Pa., as trustee, whereby he settled in trust the sum of $10,000, reserving the income to himself for life' and, after his death, to his wife, Ruth K. Hetrick, who predeceased him; and, after her death, he provided with respect to the income as follows:

"After the death of the said Ruth K. Hetrick, so much of the annual net income which shall be necessary shall be used for the upkeep of the Hetrick and Hayward burial lots in the Cemetery of the Friends' Meeting House, in Warrington Township, York County, Pennsylvania, and for taking care of all graves in said cemetery, for repairing the fences and buildings on said cemetery.

"Any income not required for said purpose shall be paid to the School District of Warrington Township, York County, Pennsylvania, to be used for general school purposes."

The appraisement for transfer inheritance tax, filed November 1, 1949, shows that decedent left an estate of the appraised value of $277,765.55. In separate opinions this day filed, we sustained four other appeals from the appraisement, thereby reducing the appraise-

ment by the sum of $23,000. The assets of the corpus of the trust are appraised at the sum of $9,998.12, on which the Commonwealth claims collateral transfer inheritance tax at the rate of 10 percent. Charles A. Hoff, Jr., Henry B. Hoff, as executors and residuary legatees under the will of decedent, and York Trust Company, as trustee under the trust agreement, have appealed from the appraisement of the corpus of the trust, and as grounds for said appeal specify, "that, by the terms of said trust, the whole, or a major part of the trust property, is exempt from transfer inheritance tax" under the taxing statutes of the Commonwealth.

The Collateral Inheritance Tax Act of May 6, 1887, P. L. 79, expressly repealed by the Inheritance Tax Act of June 20, 1919, P. L. 521, did not, in express terms, exempt bequests or trusts created for the care of cemetery lots from the imposition of the tax.

In Long's Estate, 22 Pa. Superior Ct. 370, it was held that the collateral inheritance tax was properly imposed under the above Act of 1887, upon legacies or on a fund set up in a trust, the interest of which was to be applied to the care of the graves of decedent's parents, grandparents or other relatives, but refused to decide whether such fund was taxable when the income was to be devoted to caring for and repairing decedent's own tomb.

The Act of March 5, 1903, P. L. 12, sec. 1, 9 PS §6, appears to be the first act of assembly exempting from collateral inheritance tax bequests and devises in trust for the purpose of applying the entire interest and income thereof to the care and preservation of the family burial lot or lots of a donor, in perpetual good order and repair. This Act of 1903 has not been specifically repealed.

The Act of June 20, 1919, P. L. 521, 72 PS §2301, its supplements and amendments, under which both collateral and direct inheritance taxes are now as-

sessed and collected, provides in section 2 that, in ascertaining the clear taxable value of the estate, the only deductions allowed shall be the debts of decedent and the expenses of administration.

The Act of July 12, 1923, P. L. 1078, amending section 2 of the Act of June 20, 1919, P. L. 521, added, as deductions, in ascertaining the clear taxable value of estates: "Bequests or devises in trust, in reasonable amounts, the entire interest or income from which is to be perpetually applied to the care and preservation of the family burial lot or lots, their enclosures and structures erected thereon, reasonable expenses for the erection of monuments or grave stones, grave and lot markers. . . ."

The Act of 1923 relating to this subject was reenacted without change, the last reënactment being the Act of May 27, 1943, P. L. 757.

It will be observed that the Act of 1903 *exempts* from taxation devises and bequests without limitation as to amounts, the entire income of which is to be applied to the perpetual preservation and repair of the family burial lot of decedent, while the Acts of 1923 and 1943 make such devises and bequests legal *deductions* in fixing the clear value of the taxable estate but limit such bequests to "reasonable amounts" for that purpose plus "reasonable expenses" for the erection of monuments and grave markers thereon.

The difference between an *exemption* from taxation as under the Act of 1903 and a *deduction* in fixing the clear taxable value of an estate, under the Acts of 1923 and 1943, is a difference in procedure only. The result is the same. In the instant appeal, appellants seek to get the benefits of the Acts of 1923 and 1943 via the *exemption* procedure.

Aside from the question of taxing the corpus of this trust, we are of the opinion that the amount set up for the purposes of the trust does not offend against

any principle of public policy which the good order and welfare of society have established by the legislature and by the courts. Decedent died unmarried and without issue: and, unless the .establishment of this fund violates some public policy, his collateral next of kin can find no fault with the amount set up in the trust, even though it would prove to be extravagant. Decedent was dealing with his own property and his wisdom in making a disposition of it is not for the court: Palethcrp's Estate, 249 Pa. 389; Close's Estate, 260 Pa. 269. The problem of applying the taxing statutes to this trust is the only question before this court.

Both sides to this appeal agree, and we think properly so, that the reasonable amount required of the corpus of the trust, or all of it, if necessary, to produce an income, the entire amount of which is to be perpetually applied to the reasonable care and preservation of the family burial lot or lots, their enclosures and structures, and to the reasonable expense for the erection of monuments or grave stones thereon, is not subject to transfer inheritance tax.

It is also undisputed, and we think properly so, that the part of the corpus of the trust, if any, not necessarily required to produce an income for the purposes aforesaid, the income of which, under the terms of the trust, would enure to the general benefit of the cemetery and possibly to the School District of Warrington Township, is taxable.

Considering the above two propositions of law as tenable, the questions for the court's decision are: (1) What constitutes decedent's burial lot or lots?; (2) How much of the corpus of the trust is reasonably required to produce the income for the proper upkeep of these burial lots, monuments and grave markers?

At the hearing the Commonwealth assumed the burden of proof and followed the practice laid down in Clabby's Estate, 308 Pa. 287, by offering in evidence

the official appraisement and resting. It offered no evidence in rebuttal.

Appellants, relying upon the authority of Close's Estate, supra, contended that the Commonwealth had the further burden of proving the amount of the corpus of the trust estate actually taxable in accordance with the undisputed propositions of law above stated. However, in Close's Estate, supra, the amount of the bequest was the sole question involved, while here we also have the problem of determining what constitutes the family burial lots. We regard the question of the burden of proof as of minor importance and we do not think it was error when we directed appellants to go forward with their evidence.

The uncontradicted evidence of well-informed witnesses, whose competency was not and could not have been successfully challenged, shows that the cemetery of Friends Meeting House, in which the Hetrick and Hayward burial lots are located, was originally opened about the year 1745, and contains about 2,000 graves.

The Hetrick and Hayward burial lots consist of three contiguous lots, each lot measuring 18 feet square, in the form of the capital letter L. At the top of this letter is located the Hayward lot. Adjacent to it at the bottom of the letter the Dr. Augustus C. Hetrick lot is located, and adjacent to it, at the right base of the letter, the lot of decedent, H. B. Hetrick, is located.

On the Hayward lot are located the eight graves of the maternal grandparents, uncles and aunts of decedent. On this lot is erected an antiquated, central, metal monument, with a base six feet long, three feet six inches wide, and with a height of six feet. Metal plates are attached thereon, containing the names, etc., of the various persons buried on the lot. Monuments of this type are no longer in use. Each grave also has

its own head and foot stone. One vacant place for burial remains on this lot.

On Dr. Augustus C. Hetrick's lot are located the seven graves of the parents, two sisters, a brother, a sister-in-law and a nephew of decedent. On this lot is erected a central monument of the best quality Barre granite, with a base of six feet six inches long by three feet six inches in width and seven feet high, on which the names of the deceased persons buried on the lot are cut in by sand blast. There are also head and foot stones at each grave. A duplicate of this monument would now cost at least $4,500. A vacant place for one burial remains on this lot.

On the H. B. Hetrick lot, decedent's own personal lot, are located the four graves of decedent, his wife and two sons, with appropriate head and foot stones. There are no vacant places for burial on this lot. In the center of the lot is erected a magnificent monument of best Barre granite with a base nine feet long, three feet eight inches wide and seven feet high. The original cost of this monument, when erected some years before the death of decedent's wife, was around $3,000; but, if it were to be replaced by another monument like it, the cost today would be about $7,000. This cemetery "is underlaid" with granite rock and in opening graves it is frequently necessary to do some blasting of these rocks, the result of which is to displace, and sometimes damage, other monuments and grave stones.

Thomas Cooke, one of the trustees of the cemetery and birthright member of the Friends Meeting, estimated that the annual cost of properly maintaining these three burial lots and monuments and grave markers erected thereon would be as follows: Insurance, $40; keeping lots filled and level, $25; fertilizer and seeding, $35; keeping stones in repair, $100; washing and keeping stones clean, $50; mowing and trimming grass, $65; total annual cost, $315.

David P. King, a monumental master mechanic for 36 years and in the business of selling monuments and grave markers for 22 years, testified that, at the request of the court, he went to the Friends Cemetery on February 26, 1951, and made a careful survey of these three burial lots and the various monuments and grave markers thereon erected. It is this witness who testified that the replacing of the central monument on the Augustus C. Hetrick burial lot would cost $4,500, and to replace the monument on the H. B. Hetrick burial lot would now cost at least $7,000. This witness was corroborated by the testimony of John Ernest Hartman, a member of the Cemetery Association, who said that, in his opinion, the replacement of the three monuments on these burial lots would cost at least $10,000.

From his experience in the monumental business, David P. King testified that, in his opinion, it would require around $400 annually for the upkeep of these three burial lots. This cemetery does not have any endowment fund. In fact, this particular trust fund is the first and only fund which has been created for taking care of burial lots in this cemetery. It has been the practice and the custom of the trustees to use the money realized from the sale of lots for the general upkeep of the cemetery. The individual graves were usually kept up by surviving relatives of the deceased persons buried thereon.

We have not been pointed to any appellate court decision which definitely defines a "family burial lot" as used in the several applicable acts of assembly: In Lewellen's Estate, 22 Pa. Dist. R. 80, Judge Gest, of the Orphans' Court of Philadelphia County, held that the definition of "family" as used in the several acts of assembly is to be liberally construed, so that a bequest for the care of a "family burial lot or lots" means the lot or lots in which all the relations of decedent are buried who have descended from a common ancestor,

whether these several lots be contiguous or not: In Ashbridge's Estate, 47 D. & C. 343 (Montg. Co.), Judge Holland, of the orphans' court, approves of the definition given by Judge Gest of "family burial lot or lots". We also adopt the same definition, and conclude that the Hetrick and Hayward burial lots in this cemetery constitute the burial lots of decedent.

Our second and final question is, How much of this trust fund is needed, the entire income of which is necessary to properly maintain these burial lots? It is a well known fact, of which we take judicial notice, due to economic conditions, that trust investments, as authorized by law, do not yield as high a rate of interest as they did in years past. It is our experience gleaned from the auditing of many trust estates that seldom does the net income of trust investments exceed three and one-half percent to four percent per annum, and that being so it is clear that the entire corpus of this fund would probably yield somewhere between $300 or $400 per annum, all of which would be required, according to the evidence, to properly keep up these family burial lots. It might be that sometime in the future there would be an excess of income which would enure to the general benefit of the cemetery or possibly to the school district, but that does not appear to be so at this time.

We, therefore, hold that the gross appraised value of this estate in the sum of $277,765.55, must be reduced by the appraised value of the corpus of this trust, or the sum of $9,998.12, without prejudice, however, to the right of the Commonwealth, under the authority of Close's Estate, supra, to make application in the future for the payment of collateral transfer inheritance tax when, as and if it appears that the entire corpus of this trust fund is more than necessary to accomplish the purposes of the trust under the applicable acts of assembly.

There were filed four other appeals from the transfer·inheritance tax appraisement in this estate, all of which we have sustained in separate opinions this day filed. We will, therefore, in one decree, applicable to all five appeals, reduce the appraisement of the gross estate of decedent in the total sum of the appraised values from which appeals have been taken and sustained.